UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANGELA BELLAS,

              Plaintiff,

    v.

ABRAHAM AND ABRAHAM ATTORNEYS
AND COUNSELORS AT LAW, LLC AND
IRWIN D. ABRAHAM, Jointly and severally,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE

No.: _____

COMPLAINT

JURY TRIAL DEMANDED

NATURE OF THE ACTION

1.     Plaintiff Angela Bellas alleges claims of sexual harassment and retaliation under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") against her former employers Defendant Abraham and Abraham Attorneys and Counselors at Law, LLC ("Abraham and Abraham") and Defendant Irwin D. Abraham ("Defendant Irwin," and together with Abraham and Abraham, "Defendants").

2.     Bellas alleges that Defendants willfully violated the New York Labor Law ("Labor Law") by (i) failing to pay the minimum wage, (ii) failing to pay overtime premium pay, (iii) failing to pay her for all hours worked, (iv) failing to provide the Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1, and (v) failing to provide an accurate wage statement with each payment of wages under N.Y. Lab. Law § 195.3.

3. Bellas alleges that Defendants willfully violated the Fair Labor Standards Act ("FLSA") by failing to (i) pay the minimum wage, and (ii) pay overtime premium pay.

<u>JURISDICTION AND VENUE</u>

4. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337 and 1343, and supplemental jurisdiction over Bellas' state law claims under 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Bellas' FLSA claims under 29 U.S.C. § 216(b).

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2).

6. This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

<u>THE PARTIES</u>

7. Bellas was, at all relevant times, an adult individual, residing in Arverne, New York, Queens County.

8. Upon information and belief, Abraham and Abraham is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 130-22 Rockaway Boulevard, South Ozone Park, New York 11420.

9. Abraham and Abraham is, upon information and belief, an enterprise engaged in commerce or in the production of goods for commerce. Abraham and Abraham is engaged in commerce of in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of

business is at least $500,000.00. These goods and materials have been produced for and moved in commerce, which its employees have handled, include, but are not limited to, computers, pens, paper and a fax machine.

10. Defendant Irwin was, at all relevant times, the sole member of Abraham and Abraham. He, upon information and belief, operates and controls Abraham and Abraham's day-to-day operations and management and jointly employed Bellas at all relevant times.

11. Each Defendant, either directly or indirectly, has hired and fired Bellas, controlled Bellas' work schedule and employment conditions, determined her payment rate and method, and kept at least some records regarding her employment.

<u>STATEMENT OF FACTS</u>

12. At all relevant times, Abraham and Abraham is a law firm engaging in the practice of law.

<u>Bellas' Duties</u>[1]

13. Bellas commenced her employment with Defendants on March 14, 2019 as a legal assistant.

14. As a legal assistant, Bellas' primary duties involved drafting summonses, complaints, affidavits, and stipulations and scheduling depositions.

15. On or about March 22, 2019 Defendant Irwin promoted Bellas to the position of office manager.

---

[1] The subject lines are included only for organizational purposes.

16.     As an office manager, Defendants required Bellas to oversee the work of the receptionist and other office assistant, in addition to the duties that she performed as a legal assistant.

Sexual Harassment

17.     The Abraham and Abraham work environment is rampant with unlawful harassment, which goes unchecked and where the victims are retaliated against when they reject their supervisors' sexual advances.

18.     Throughout her employment at Abraham and Abraham, Defendant Irwin sexually harassed Bellas on numerous occasions.

19.     On March 15, 2019, Bellas' second day of work, Defendant Irwin sent her several sexually suggestive text messages including "I'm doing the breast job I can. Sorry I could'tit be more humpful[,]" and "[c]um on. Give me some creTit[.]"

20.     Later that day, Defendant Irwin trained Bellas, which required Bellas to be alone with him in his office throughout the day (the "Training").

21.     During the Training, Defendant Irwin sexually harassed Bellas. The following of which are representative examples:

        a.     He told her that he had a "herum of women" and that he prefers them to wear certain types of clothing.

        b.     He told her that she would eventually replace the office manager, Stephanie, the office manager, as his "main squeeze."

        c.     He stated that his "own preference" was for everyone at work to "dress as slutty as possible."

d.　　He requested to see "dominatrix photos" of Bellas "for payroll purposes."

e.　　He requested that she give him "a blow job for a bigger [computer] screen" -- proposing a *quid pro quo* relationship.

f.　　He repeatedly told her that she was a "cutie pie," "cute" and "intriguing."

g.　　He requested that she sit in his office all day because it "puts [him] in a good mood."

h.　　After getting off a phone call, he told her that "it's so hard to be on the phone while [he's] so turned on by [her]."

i.　　He asked her if she was single and she said yes, at which point he asked her "so you're not dating anyone? Hm…"

j.　　He repeatedly told her that she is "very beautiful."

k.　　When he asked Bellas how to wash a suede jacket, she told him that he should have it dry cleaned because it would shrink in the washing machine. He responded "that's what she said . . . mmm a little shrinkage," a reference to his penis.

l.　　On one occasion, when Bellas walked into his office, he was standing naked with a towel around his waist.

22.　　During the Training, Defendant Irwin provided Bellas with details of his sex life. For example, he informed her that he is a dominatrix, and that he loves women to be his subordinates.

23.　　Defendant Irwin also told Bellas a story about a sexual encounter he had with a woman. He stated that as the woman was "blowing [him], she started to eat [his]

a-- hole," which caused the woman's breath to "stink like a--." This "completely turned [him] off" and he left. He said that situation "messed with" him because the breath of one of the attorneys who worked for him smelled exactly like the woman's breath after she "ate his a-- hole."

24. Defendant Irwin further told Bellas that he dated a stripper who would "bring other women into bed with them." He realized this woman was "most likely a lesbian" and was using him in order to have sex with other women. Defendant Irwin stated that he "had enough" of this woman when she told him that she wanted them to have sex with her cousin. He broke up with her and then started dating her cousin whom she wanted to have sex with. He told Bellas that he thought it was very funny how upset the stripper was about his relationship with her cousin.

25. After the Training, Defendant Irwin asked Bellas to stay late in order to help him organize the room that would be her office. Once the other employees in the office left, however, he began to talk to her about her parents' recent death, which caused her to tear up. He asked her if he could hug her, and then started walking towards her, put his arms around her and started breathing deeply, sniffing her and inhaling her scent. This caused him to get an erection and he began to rub his penis against Bellas, while grunting and moaning. Bellas rejected these advances by pulling away from him and stating "that was not the kind of hug I was expecting. Can we please proceed to organize my office?"

26. Later that night, at around 1:20 a.m., Defendant Irwin sent Bellas a text message stating "[j]ust got back. Have you on my mind. Tushie." She rejected this advance by sending him a text message the following morning containing a picture, or an

"emoji," of a woman putting her hand over her face, which is used to show frustration or embarrassment. In response, he sent her a text message stating "Lol. You're cute."

27.     On Sunday, March 17, 2019, Defendant Irwin sent Bellas a text message asking her is she was worried it would feel weird for her at work the following day because of the incidents that took place during the Training. Bellas responded that she was fine until he asked her if she was worried. In response, Defendant Irwin wrote that he "feel[s] that making people uncomfortable give[s] [him] an advantage in terms of power. Lol . . . I'm sowwwwy."

28.     Bellas then sent Defendant Irwin a text message asking him if he would fire her if they never had sex, to which Defendant Irwin responded "[h]oly crap . . . I guess you have the same trick as me. Lol . . . unmmmmm Awkwaaaard[.]"

29.     Defendant Irwin then sent her a text message assuring her that "if [she] want[s] [he] will keep it professional. The last thing [he] want[s] is to make [her] uncomfortable." Bellas informed him that she wished to keep their relationship professional and he assured her that he would. Approximately thirty minutes thereafter, he sent her a text message, which included an "emoji" of someone sending a kiss, and stated "[y]ou're such an amazing person. So many impressive qualities."

30.     The next day, on March 18, 2019, Bellas informed Defendant Irwin that Stephanie "went nuts on her" and was acting aggressive. Stephanie and Defendant Irwin, upon information and belief, had sexual relations and Stephanie was jealous that Defendant Irwin was pursuing Bellas.

31.     Defendant Irwin then called Bellas into his office and when she got there, he was holding his hands out, suggesting that he wanted to give her a hug. She told him

that she was fine, but he continued to approach her and said, "come on, come here." Defendant Irwin put his arms around Bellas and then grabbed her butt with both hands and pushed her pelvis against his. She rejected these advances by moving away and asking him "are you serious right now?" He responded, "God, I'm just kidding around tryna make you feel better. What's your problem?" Bellas then left his office and sent him a text message stating that she was going home.

32. On March 19, 2019 Defendant Irwin told Bellas that he would "take care of Stephanie" and that she had nothing to worry about. He then held a meeting with Stephanie and Bellas in which Stephanie stated "it's either her or me," to which Defendant Irwin responded "well I already had [Stephanie]," implying that he had sexual relations with Stephanie and still wanted to have sexual relations with Bellas. Stephanie quit immediately thereafter.

33. On March 20, 2019, after Stephanie quit, Bellas and Defendant Irwin were the only two people in the office. Defendant Irwin, upon information, was living at Abraham and Abraham's offices, and when Bellas walked into the office he had just gotten out of the shower, and was standing completely naked with only some furniture partially blocking him. After he got dressed, he came into her office and told Bellas that she looked "sexy," walked towards her and appeared as if he was going to kiss her. He grabbed her face very hard, and when she pushed him off of her, he denied that he was trying to kiss her and said "what's wrong with you, I wasn't going to kiss you."

34. On March 21, 2019, on his way back to the office from court, Defendant Irwin called Bellas and asked her sexually suggestive questions such as "what are you wearing?" and "are you thinking about me?" He also told her "come on, touch yourself."

35. Later that day, Defendant Irwin asked Bellas to fax something for him. He then approached her from behind as she was dialing the fax number and rubbed his penis against her butt, while saying "atta girl, you got it." She rejected his advances by immediately moving away from him, to which he stated "what's wrong, you were doing so good."

36. On March 22, 2019 Defendant Irwin interviewed a woman to work at the front desk. Bellas asked him what her name was, to which he responded, "I can't remember, but I can tell you her [bra] cup size." She later found out that the woman's name was Jackie and he hired her to work as a receptionist at the front desk.

37. Later that day, Defendant Irwin approached Bellas and offered to promote her to the position of office manager and pay her a salary of $700 per week. She then attempted to talk to him about his inappropriate behavior towards her, at which point he grabbed her chin and said "you like this job? If you want to keep this job repeat after me: 'Irwin never touched me. Got it?'" Bellas responded "got it" and walked out.

38. On March 26, 2019 Bellas sent Defendant Irwin a text message asking if he was okay because she overheard him on a personal call earlier in the day. He said he was very sad and "need[ed] love." She then sent him a text message explicitly requesting that he stop sexually harassing her:

> I actually want to clarify something, I've never grabbed your hand or initiated anything. Have I let you hold my hand, yes! But I have tried – in directly- to get you to accept the fact that other than friendship, it's not going to happen. But I've noticed you're not catching my subtleties so unfortunately I now have to be blunt. I'm sorry for the timing but I think on another hand the timing was just right because of what you text me.

39.    Bellas then reiterated that she "LIKE[S] [him] as a friend. But not if [he] continue[s] to push this love thing on [her.]" He responded that he is "not pushing ANYTHING on [her]. Please. Sense the tone[.]" Bellas sent him a text message, again explicitly requesting that he stop sexually harassing her:

> Can't sense tone via text. And I'm just expressing how I feel. I really need you to just 'hear' me. If you were not my boss, I would have made my feelings or lack there of very clear from day one. You have really put me in uncomfortable moments. And I've expressed how stressed relationships make me feel, how I love being alone, how I'm not in a sexual state of mind and body at this point in my life and yet the moment we are alone, you reach for my hand, blow kisses, give kisses and you have left me no other choice other than to be brutally honest. You are not respecting my wishes. Please I just want to work, do a great job and make you proud as my employer.

40.    Defendant Irwin responded "[i]f you see me do any of that ('reach for your hand, blow you kisses, give you kisses') or otherwise make you uncomfortable, please point it out to me immediately." He then denied having ever sexually harassed her.

41.    On March 29, 2019, Defendant Irwin asked Bellas to come to his office. During this meeting, he continuously asked Bellas if she wanted a drink of alcohol even though he knew that she had previously battled alcoholism and was in recovery. She repeatedly rejected his offers, but he persisted until she finally yelled "NO!" He, thereafter, made sexual comments to her such as "the clothes you have been wearing make you look sexy and sophisticated." He then stated that he "really want[ed] to be with [her]" and wanted to know why she wouldn't "cave in." In a further attempt to persuade Bellas to have sexual relations with him, he suggested that they sign a contract that would set forth the terms of their relationship. She asked to see the contract out of curiosity, and he interpreted that request to mean that she was interested in having sexual relations with

him. He, accordingly, put his arms around her and tried to stick his tongue in her mouth. She rejected this advance by pushing him off of her.

42.     On April 2, 2019 Bellas told Defendant Irwin that she was having some issues with Jackie. He asked her to come to his office and, when she did, he asked her to "come over here and show me exactly what she did." She walked towards his desk to show him what had happened, at which point he put his arms around her, cupped her left butt cheek and pulled her onto his lap. She rejected these advances by getting up immediately and walking out of his office.

Retaliation

43.     After Bellas complained to Defendant Irwin and rejected his sexual advances, he retaliated against her by engaging in a pattern of hostile behavior towards her.

44.     For example, on or about March 27, 2019, the day after she sent him text messages requesting that he stop sexually harassing her, Defendant Irwin baselessly accused Bellas of acting inappropriately in the way that she was managing Jackie. Bellas responded to his accusations by stating "you are the one who is acting in appropriate by rubbing your dick on me." He then threatened to fire her by saying "do you want to work here?" --- suggesting that she stop verbalizing that he had sexually harassed her or he would fire her. Bellas responded that she wanted to work there if he agreed not to touch her.

45.     On April 5, 2019 one of Abraham and Abraham's clients came into its office to sign some paperwork. While he was there, Defendant Irwin made fun of Bellas and laughed at her because she was unable to pronounce the client's name. The client

then refused to sign any paperwork and left immediately. Defendant Irwin called the client an "a--hole" and a "piece of sh-t jerk" for leaving without signing the paperwork. Bellas told him she disagreed with him and believed that the client left because he heard what Defendant Irwin was saying. He got very defensive and aggressive, at which point Bellas became scared, backed down and told him that she agreed with him. She then asked if it would be okay for her to step outside and get a cigarette, at which point Defendant Irwin became aggressive and told her, "absolutely, you need to go, go now in fact, I need you to get out of my face right now." She grabbed her belongings and started to leave the office, at which point he started to scream "you're leaving??" She continued to walk out of the building. He then harassed her by sending her repeated text messages requesting that she give him back the keys to the office.

46.     He also repeatedly sabotaged her work and accused her of failing to complete certain assignments and calendaring events, which he, upon information and belief, deleted in order to harass her.

47.     Bellas' work environment became so intolerable that no reasonable person in her position would remain, resulting in her separating from Defendants on April 15, 2019.

48.     Bellas was constructively discharged.

49.     Bellas, as a result of the sexual harassment and retaliation she faced while working at Abraham and Abraham, has started to see a therapist.

50.     Bellas has not been able to find a new job since she was constructively discharged from Abraham and Abraham.

FLSA and Labor Law Violations

51.     From March 14, 2019 to March 15, 2019, Defendants required Bellas to participate in training sessions from 9:00 a.m. to 6:00 p.m., with a 30-minute meal break, totaling 17 hours (the "Training Sessions").

52.     From March 18, 2019 to March 22, 2019, Defendants required Bellas to work from approximately 8:30 a.m. to 6:00 p.m. each day, with a 30-minute meal break, totaling 45 hours.

53.     From March 25, 2019 until April 5, 2019, Defendants required Bellas to work from 8:00 a.m. or 8:30 a.m. to 6:00 p.m. or 6:30 p.m., with a 30-minute meal break, 5 days per week, totaling 45 to 50 hours per week.

54.     From April 8, 2019 to April 12, 2019, Defendants required Bellas to work from 8:30 a.m. to 5:30 p.m. each day, with a 30-minute meal break, totaling 42.5 hours.

55.     On Bellas' last day of work, April 15, 2019, she worked from 8:30 a.m. until 5:00 p.m., with a 30-minute lunch break, totaling 8 hours.

56.     Throughout her employment, Defendants paid Bellas her wages by check.

57.     Defendants failed to pay Bellas for any of her time spent at the Training Sessions.

58.     From March 18, 2019 to March 22, 2019 Defendants paid Bellas $15.00 per hour for all hours worked.

59.     From March 25, 2019 to April 5, 2019, Defendants paid Bellas $15.00 for 40 hours of work each week, and failed to pay her for any of the time she worked in excess of 40 hours. Defendant Irwin, in fact, sent Bellas a text message stating "I have to keep everyone's hours at 80 every 2 weeks. So calculate if you can from last week and

this week and see what's left over" --- acknowledging that he refused to pay her any overtime for the hours she worked in excess of forty each week.

60.     From April 8, 2019 to April 15, 2019 Defendants failed to pay Bellas any wages.

61.     On April 15, 2019, after Bellas quit she requested that Defendant Irwin pay her the remaining wages Defendants owed her. She also complained that he failed to pay her overtime premium pay for one of the weeks in which she worked 45 hours. He, in response, threatened to reduce her regular rate of pay to the minimum wage for the last check she was owed.

62.     On April 26, 2019 Defendant Irwin sent Bellas a text message requesting that they reach an agreement "in terms of the hours [she] worked, and the rate of [her] pay,"-- acknowledging that he did not keep track of her hours worked as he was required to do under the law. He also requested that she "sign something" in order to resolve the amount of money he owed her and told her that if they did not reach an agreement by 1:00 p.m., he would not pay her the amount she was required to be paid.  He also told her that his "suggestion is [she] drop the overtime BULLSH-T."

63.     Defendants did not provide Bellas with a Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1 when she was hired or at any point in her employment.

64.     Defendant did not provide Bellas a wage statement with each payment of wages as required under N.Y. Lab. Law § 195.3.

## FIRST CAUSE OF ACTION
## SEXUAL HARASSMENT UNDER THE NEW YORK STATE HUMAN RIGHTS LAW AS AGAINST ALL DEFENDANTS

65.     Bellas repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

66.     At all relevant times, Bellas was an "employee" and "person" within the meaning of the NYSHRL and Defendants were "employers."

67.     The NYSHRL prohibits employment discrimination and harassment based on gender. N.Y. Exec. Law § 296(1)(a).

68.     Bellas was subjected to unwelcomed sexual conduct in the workplace that constitutes sex-based harassment.

69.     Abraham and Abraham is vicariously liable for an actionable hostile and discriminatory environment created by its supervisors who had immediate or successively higher authority over Bellas.

70.     Defendant Irwin had the authority to affect Bellas' employment terms and conditions.

71.     Defendant Irwin is personally liable for the damages under this claim because he constitutes an employer and participated in the conduct giving rise to this claim. N.Y. Exec. Law §§ 296(1), 296(6).

72.     As a result of Defendants' harassment of her, Bellas has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

## SECOND CAUSE OF ACTION
### GENDER BASED HARASSMENT UNDER THE NEW YORK CITY HUMAN RIGHTS LAW AS AGAINST ALL DEFENDANTS

73.     Bellas repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

74.     At all relevant times, Bellas was an "employee" and "person" within the meaning of the NYCHRL and Defendants were "employers."

75.     Bellas was treated less well than her male colleagues because of her gender, violating N.Y.C. Admin. Code § 8-107(1)(a).

76.     Abraham and Abraham is strictly liable for the actionable hostile environment created by its supervisors who had immediate or successively higher authority over Bellas.

77.     As a result of Defendants' harassment of her, Bellas has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

78.     Defendants harassed Bellas with malice and/or reckless indifference to her rights under the NYCHRL.

79.     As a result of Abraham and Abraham's unlawful conduct, Bellas can recover punitive damages against Abraham and Abraham. N.Y.C. Admin. Code § 8-502.

## THIRD CAUSE OF ACTION
### UNLAWFUL RETALIATION UNDER NEW YORK CITY HUMAN RIGHTS LAW AS AGAINST ALL DEFENDANTS

80.     Bellas repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

81.     The NYCHRL prohibits employers from retaliating or discriminating in any manner against any person because such person has opposed any practice the NYCHRL forbids. N.Y.C. Admin. Code § 8-107(7).

82.     Under the NYCHRL, the retaliation or discrimination complained of need not result in an "ultimate action" with respect to the employee, or even in a materially adverse change in the employee's terms and conditions, provided that the retaliatory or discriminatory act(s) complained of would be reasonably likely to deter a person from engaging in protected activity. Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)).

83.     Bellas took action to oppose Abraham and Abraham's hostile work environment.

84.     Defendants engaged in conduct that was reasonably likely to deter a person from engaging in such conduct, violating the NYCHRL's anti-retaliation provision. N.Y.C. Admin. Code § 8-107(7).

85.     A causal connection exists between Bellas' opposition and Abraham and Abraham's conduct.

<u>FOURTH CAUSE OF ACTION</u>
RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

86.     Bellas repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

87.     Under the NYSHRL, "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer . . . to . . . discriminate against any person because [s]he has opposed any practices forbidden under this article or because [s]he has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(1)(e).

88.     Bellas engaged in protected activity, having opposed practices the NYSHRL forbids; Defendants were aware of Bellas' participation in the protected activity; Defendants took adverse action against Bellas; and a causal connection existed between Bellas' protected activity and the adverse action Defendants took.

89.     No legitimate, non-retaliatory reasons exist for the adverse action Defendants took against Bellas.

<u>FIFTH CAUSE OF ACTION</u>
FAILURE TO PAY THE MINIMUM WAGE UNDER THE FLSA

90.     Bellas realleges every preceding allegation as if set forth in this cause of action.

91.     Defendants employed Bellas under the FLSA.

92.     Defendants knowingly failed to pay Bellas the minimum wages to which she was entitled under the FLSA.

93.     Defendants were required to pay Bellas the full minimum wage rate for all hours worked.

94.     As a result of Defendants' FLSA violations, Bellas has suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation under 29 U.S.C. § 216(b), and such other legal and equitable relief as this Court deems just and proper.

<u>SIXTH CAUSE OF ACTION</u>
FAILURE TO PAY OVERTIME UNDER THE FLSA

95.     Bellas realleges every preceding allegation as if set forth in this cause of action.

96.     Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce under the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

97.     Defendants were required to pay Bellas no less than 1.5 times the regular rate at which she was employed for all hours worked in excess of 40 hours in a workweek under the overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201, *et seq*., including 29 U.S.C. §§ 207(a)(1) and 215(a).

98.     At all relevant times, Defendants had a policy and practice of refusing to pay Bellas the proper overtime compensation for her hours worked in excess of 40 hours per workweek.

99.     Defendants were aware or should have been aware that the practices described in this Complaint were unlawful, making their violations willful or reckless.

100.     Defendants have not made a good faith effort to comply with the FLSA with respect to Bellas' compensation.

101.     Defendants have failed to make, keep and preserve records with respect to their employees sufficient to determine the wages, hours, and other conditions and practices of employment, violating the FLSA, 29 U.S.C. §§ 201, 207(a)(1) and 215(a).

<u>SEVENTH CAUSE OF ACTION</u>
FAILURE TO PAY THE MINIMUM WAGE
UNDER THE NEW YORK LABOR LAW

102.     Bellas realleges every preceding allegation as if set forth in this cause of action.

103.     Defendants are "employers" under N.Y. Lab. Law §§ 190, 196-d, 651(5) and supporting New York State Department of Labor Regulations and employed Bellas.

104.    The wage payment provisions of Article 6 of the Labor Law and supporting New York State Department of Labor Regulations apply to Defendants and protect Bellas.

105.    Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Bellas the statutory minimum wage.

106.    Upon information and belief, Defendants failed to post, in a conspicuous place upon their premises, a notice issued by the New York State Department of Labor summarizing minimum wage provisions, violating the Labor Law and supporting New York State Department of Labor Regulations. 12 N.Y.C.R.R. §§ 137-2.2, *et seq.*

107.    Defendants have willfully violated the Labor Law by knowingly and intentionally failing to pay Bellas the minimum wage.

108.    Due to Defendants' Labor Law violations, Bellas is entitled to recover from Defendants her unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre and post-judgment interest.

<u>EIGHTH CAUSE OF ACTION</u>
FAILURE TO PAY THE OVERTIME PREMIUM PAY
UNDER THE NEW YORK LABOR LAW

109.    Bellas realleges every preceding allegation as if set forth in this cause of action.

110.    Defendants are employers under N.Y. Lab. Law §§ 190, 196-d, 651(5), 652 and supporting New York State Department of Labor Regulations and employed Bellas.

111.     Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Bellas 1.5 times her regular rate of pay for all hours she worked in excess of 40.

112.     Defendants failed to pay Bellas overtime premium pay for any hour she worked above 40 in a week, violating the Labor Law. 12 N.Y.C.R.R. § 142-2.2

113.     Defendants failed to compensate Bellas at her overtime premium rate for any hours worked in excess of 40 per week.

114.     Defendants have willfully violated the Labor Law by knowingly and intentionally failing to pay Bellas the correct amount of overtime wages.

115.     Due to Defendants' Labor Law violations, Bellas is entitled to recover from Defendants her unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre and post-judgment interest.  N.Y. Lab. Law § 663.

NINTH CAUSE OF ACTION
FAILURE TO PROVIDE 195.1 NOTICE UNDER THE NEW YORK LABOR LAW

116.     Bellas realleges every preceding allegation as if set forth in this cause of action.

117.     Defendants willfully failed to supply Bellas with the required Notice and Acknowledgement of Pay Rate and Payday under N.Y. Lab. Law § 195.1(a) within ten business days of her first employment date.

118.     Due to Defendants' violations of N.Y. Lab. Law § 195.1, Bellas is entitled to recover from Defendants $50.00 for each work day that the violations occurred or continue to occur, up to a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab. Law § 198(1)-b (2016).

## TENTH CAUSE OF ACTION
## FAILURE TO PROVIDE 195.3 WAGE STATEMENT
## UNDER THE NEW YORK LABOR LAW

119.    Bellas realleges every preceding allegation as if set forth in this cause of action.

120.    Defendants willfully failed to supply Bellas with an accurate wage statement with each payment of wages, violating N.Y. Lab. Law § 195.3.

121.    Due to Defendants' violations of N.Y. Lab. Law § 195.3, Bellas is entitled to recover from Defendant $250.00 for each work day that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab. Law § 198(1)-d (2016).

## PRAYER FOR RELIEF

WHEREFORE, Bellas respectfully requests that this Court grant the following relief:

1.    Accepts jurisdiction over this matter.

2.    Impanels and charges a jury with respect to the causes of action.

3.    Awards Bellas the following damages against Abraham and Abraham and Defendant Irwin:

a.    Back pay, front pay, and all benefits along with pre and post judgment interest in the amount of at least $100,000.00;

b.    An award of punitive damages under the NYCHRL;

c.    Punitive, liquidated and compensatory damages including, but not limited to, damages for pain and suffering, anxiety, humiliation, loss of enjoyment of life, physical injury and emotional distress, and medical expenses in order to compensate her

for the injuries she has suffered and to signal to other employers that discrimination, harassment and retaliation are repulsive to legislative enactments in the amount of at least $500,000.00;

       d.     A declaratory judgment that the practices complained of herein are unlawful under the Labor Law;

       e.     An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

       f.     An award for unpaid minimum wages under the Labor Law and the FLSA;

       g.     An award for unpaid overtime premium pay under the Labor Law; and the FLSA;

       h.     An award for failing to provide the N.Y. Lab. Law § 195.1 Notice;

       i.     An award for failing to provide the N.Y. Lab Law § 195.3 Wage Statements;

       j.     An award of liquidated damages as a result of Defendants' Labor Law violations;

       k.     An award of liquidated damages as a result of Defendants' willful FLSA violations;

       l.     An award of pre-judgment and post-judgment interest;

       m.     Attorneys' fees, costs and expenses to the fullest extent permitted by law; and

n.      Any other relief that this Court deems just and equitable.

PRAYER FOR RELIEF

Pursuant to Fed. R. Civ. P. 38(b), Bellas demands a trial by jury on all questions

of fact the Complaint raises.


Dated: New York, New York
       August 27, 2019

LIPSKY LOWE LLP


By: s/ Douglas B. Lipsky
   Douglas Lipsky
   Sara Isaacson
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
212.392.4772
doug@lipskylowe.com
sara@lipskylowe.com
*Attorneys for Plaintiff Angela Bellas*